UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANDREW P. MALLON, | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) ) | NO. 4:14-CV-40027-TSH |
| v. | ) ) ) | |
| JOHN MARSHALL, and DENNIS J. GOEBEL | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 48)**

**September 30, 2016**

**HILLMAN, D.J.**

Plaintiff Andrew Mallon brings this action seeking a declaratory judgment that he is co-owner of the copyright in a scientific paper, *Impairment of TrkB-PSD-95 Signaling in Angelman Syndrome*, published in the academic journal PLoS Biology on February 12, 2013. Dr. Mallon also seeks an accounting, full retraction of the paper from the journal, damages, costs and attorney fees. Defendants John Marshall and Dennis Goebel, co-authors of the paper, moved for summary judgment on the grounds that i) Dr. Mallon's contributions to the paper were made within the scope of his employment as a postdoctoral research associate at Brown University, and thus constitute a "work for hire" pursuant to the Copyright Act of 1976, 17 U.S.C. § 201(b); and ii) the published PLoS Biology paper is not a "joint work" of Dr. Mallon and the Defendants, as defined

1

in 17 U.S.C. § 101.  For the reasons set forth below, the Defendants' motion for summary judgment (Dkt. #48) is ***granted***.

## Background

Dr. Andrew Mallon joined Brown University as a Postdoctoral Research Associate in July 2007, and in mid-2008 began working in the laboratory of Dr. John Marshall, a professor and principal investigator in the Department of Molecular Pharmacology, Physiology, and Biotechnology.  From January to October 2011, Dr. Mallon and Dr. Marshall co-authored a manuscript related to research conducted in Dr. Marshall's lab.  This manuscript, titled *Defective BDNF Signaling in Angelman Syndrome and Rescue by Modulating PSD-95-Arc Interactions*, was submitted to the scientific journal "Neuron" on October 26, 2011, with Dr. Mallon listed as first author, and Drs. Marshall and Goebel, along with five others, listed as co-authors.  Dr. Mallon continued to make edits to the manuscript in November and December 2011, after it was submitted to Neuron, in anticipation of reviewer comments.

On December 1, 2011, Dr. Marshall received notice from Neuron declining publication of the manuscript.  Dr. Marshall forwarded this email, which included commentary from the reviewers, to Dr. Mallon, inquiring whether Dr. Mallon had "[a]ny suggestions." Dkt. #48-2, Ex. 19.  Dr. Mallon replied with his thoughts on the reviewers' comments, and provided a list of other journals to which they might consider submitting, including PLoS Biology.  On December 9, 2011, Dr. Marshall sent an email to Dr. Mallon, stating "I agree with you about submitting to PLOS biology.  It has a good impact factor.  I plan to contact them with a presubmission letter." Dkt. #48-2, Ex. 20.  At some point by the Fall of 2011, the collaborative relationship between the parties had deteriorated.

In preparation for submission of the manuscript to PLoS Biology, Dr. Marshall emailed Dr. Goebel an edited draft of the manuscript which listed Dr. Mallon as fourth author, and asked for Dr. Goebel's thoughts on his proposed changes to title and authorship. Dkt. #53-7.  A revised version of the paper was submitted to PLoS Biology in March 2012, which did not list Dr. Mallon as an author.  This submission was followed by a May 4, 2012 letter to Dr. Marshall from an editor at PLoS Biology, declining to publish the manuscript.  The letter stated,

> Based on the reviews and discussion with our academic editor, I regret that we will not be able to accept the current version of the manuscript for publication.  We would, however, be willing to consider an extensively revised version if you are able to fully address all of the reviewers' concerns, with additional data, to an extent that satisfies our reviewers and our editorial standards.  Such a revised manuscript would be treated as a new submission….(Dkt. #48-3).

Throughout 2012, the manuscript was rejected, revised, and resubmitted multiple times as part of the peer review process.  After each rejection from the journal, and in response to reviewer comments, new experiments were conducted, new data and figures were generated, and new text was drafted and included with the resubmissions.  Some of this new material was contributed by individuals listed as authors on the PLoS Biology paper that were not authors on the manuscript submitted to Neuron.

Early in the process of preparing the paper for submission to PLoS Biology, Dr. Mallon indicated that he and Dr. Marshall came to disagree over the inclusion of certain content.  Dr. Mallon lacked confidence in the integrity of this work, stating that "as an *author*, I would not have

3

allowed fabricated and falsified data to be published." Dkt. #53-1, ¶ 126 (emphasis added). There was no communication between Dr. Mallon and the Defendants between December 10, 2011 and February 2013, when the PLoS Biology paper published. After publication, Dr. Mallon contacted PLoS Biology and informed the journal of his opinion that the paper was "unsafe due to scientific misconduct," that his "result had been manipulated to remove honest results that did not conform," and that "much of the data in the report is scientifically unreliable due to serious and systematic problems with data integrity." Dkt. #53-1, ¶¶139-143.

Dr. Mallon was not listed as an author on the published PLoS Biology paper, but his contributions were noted in the "Acknowledgements" section.

## **Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (citation omitted). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 153 (1st Cir. 2009). The moving

party bears the burden of demonstrating the absence of a genuine issue of material fact within the record. *Id.* at 152. "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (quoting *DeNovellis*, 124 F.3d at 306) (citation omitted). A trial judge acts well within his authority on a summary judgment motion in assessing the reasonableness of the inferences that might be drawn from the circumstantial evidence. *Ricci v. Alternative Energy, Inc.*, 211 F.3d 157 (1st Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## Discussion

"The authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). The Copyright Act defines a "joint work" as one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "For a work to be 'joint,' the authors must have intended, 'at the time the writing is done', that their contributions be merged into 'an integrated unit.'" *Greene v. Ablon*, 794 F.3d 133, 151 (1st Cir. 2015) (quoting *Childress v. Taylor,* 945 F.2d 500, 505 (2d Cir.1991)). "Joint authors share 'equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint author for any profits that are made.'" *Id.* (quoting *Thomson v. Larson,* 147 F.3d 195, 199 (2d Cir. 1998)).

Under the Copyright Act, "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work

has been prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101. A derivative work is one "based upon one or more preexisting works," 17 U.S.C. § 101, and "consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work." *Mass. Museum of Contemporary Art Found., Inc. v. Büchel*, 593 F.3d 38, 64–65 (1st Cir. 2010) (quoting Melville B. Nimmer, 3–8D *Nimmer on Copyright* § 3.03[A]). "Even though one co-author has the right to revise a joint work in order to create an individual derivative work, the other co-author acquires no property rights in the newly created work prepared without his involvement." *Weissmann v. Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989).

Dr. Mallon's claim to authorship in the published PLoS Biology paper hinges on whether, at the time the work was created, he and the other authors intended their contributions be a joint work, "merged into inseparable or interdependent parts of a unitary whole."[1] The parties do not dispute that Dr. Mallon and Dr. Marshall shared such an intent and created a joint work when they prepared and submitted their manuscript to Neuron.[2] However, Defendants now assert that after the parties fell out and Dr. Mallon left Brown University, they no longer intended to create a joint work with him. Defendants argue that the manuscript sent to PLoS Biology was a "new submission," or "at the very least…a derivative work," containing material borrowed from the paper submitted to Neuron, but substantially recast so as to create a separate work. Dkt. #49, pgs. 17-19.

As evidence, Defendants highlight the undisputed fact that the authors did not communicate with Dr. Mallon at any point between January 2012 and February 2013 – the year they spent generating new data, revising, and resubmitting the manuscript to PLoS Biology.

---

[1] 17 U.S.C. § 101
[2] Though Defendants assert that Brown University owned the copyright to Dr. Mallon's contributions as "works for hire" pursuant to 17 U.S.C. § 201(b).

Defendants also point to additional experiments conducted and documented in the published PLoS Biology paper, new authors added (together with their contributions), as well as significant changes made to the text and figures. That Dr. Mallon is not listed as an author on the paper is also offered as evidence that Defendants did not intend to create a joint work with him, and this conclusion is supported by their affirmative acknowledgment of his contribution (short of authorship) in the paper ultimately published in PLoS Biology.

Dr. Mallon contends that the published PLoS Biology paper represents the result of contributions made "with the intention and understanding that they would be integrated into a paper that would go through multiple iterations and that the authors would ultimately publish," and that the submissions to PLoS Biology and Neuron are simply iterations of the same paper made during one creative process. Dkt. #53, p. 16. Dr. Mallon notes that he continued work on the draft manuscript after it was submitted to Neuron, and highlights the fact that he was listed as a fourth author on an early draft of the manuscript that would later be submitted to PLoS Biology. Dkt. #53-7.

However, Dr. Mallon also makes clear that he would not have allowed the paper publish as is.[3] Significantly, he seeks not to be added as an author, but rather full retraction of the manuscript from the journal.[4] It is difficult to reconcile Dr. Mallon's acquiescence in the Neuron

---

[3] Dr. Mallon's signed declaration states, "I told Dr. Marshall that I believed we would need to repeat Dr. Cao's data to be able to publish the paper with confidence in its integrity….[a]s an author, I would not have allowed fabricated and falsified data to be published." Dkt. #53-1 ¶¶ 126, 139-143; "It was not my intention to re-publish it…I only asked PLOS Biology for a retraction and did not ask for my name to be restored to the paper (which could be achieved via a Correction). Given the problems with…fabricated data and the lack of any verification, it is now impossible to rely on it in any shape." Email from Andrew Mallon to Carolyn Johnson (Apr. 17, 2015) (Dkt. #55-3).

[4] In the original Complaint filed (Dkt. #1), the plaintiff's prayer for relief included "[r]epublication of the PL[o]S Biology listing Dr. Mallon as the first author," however, this request was removed in the First Amended Complaint (Dkt. #41). Further, in an email from Dr.

7

submission and his vehement objection to the publication of the PLoS Biology paper with this contention that both manuscripts represented a continuous, successive work that he now claims to be a unified, integrated whole. This begs the underlying question, does a joint author in an antecedent work who withdraws their intent to collaborate, destroy the mutual intention that contributions be merged into interdependent parts of a unitary whole required to sustain joint authorship in a successor work?

The First Circuit makes clear in *Greene* that, in order to create joint work, "authors must have intended, *at the time the writing is done, that their contributions be merged into an integrated unit*." *Greene*, 794 F.3d at 151 (emphasis added). While this intent clearly existed during the early part of the project, at some point, Dr. Marshall's inclusion of material to which Dr. Mallon objected altered Dr. Mallon's intent with respect to the project. The paper then existed in a version that Dr. Mallon no longer wished to see published, thus it was not the unified, integrated "whole" that he intended to create. It does not make sense to ascribe irrevocability to the requirement of intent at the beginning of a creative project and not allow for a parting of the ways. Dr. Mallon's own Declaration acknowledges that he believes that the Defendants removed his name from the list of authors precisely because of such a disagreement. Dkt. #53-1, ¶126. Although the court acknowledges that Dr. Mallon feels his removal as an author was "improper," both parties unambiguously have demonstrated their lack of agreement over the content of the final version. *Id.*

Once a joint author decides not to participate in or create the inseparable, unified whole they first set out to create, that author's recourse is to remove himself from the publication, not to

---

Mallon to Carolyn Johnson, he states that the request in the original Complaint to correct authorship by adding his name was "a mistake," and that he was "only pursuing a retraction right from the start." Email from Andrew Mallon to Carolyn Johnson (Apr. 17, 2015) (Dkt. #55-3).

suppress the expression of each of the other authors. Copyright law exists to encourage expression, not extinguish it. It is improper to suggest that the rights of the listed authors on the PLoS Biology paper be abridged, and they not be allowed to publish their own expression, simply because one of the original parties in an antecedent joint work ceased to agree with them.

Dr. Mallon cites *Garcia v. Google*, 786 F.3d 733, 742 (9th Cir. 2015), for its assertion that treating each iteration or edit of a complicated work as a separate copyrightable work would "make Swiss cheese of copyrights." This court appreciates the concerns raised in *Garcia*, but does not read those concerns to mean that the cheese can never be divided. Here, it is sliced into two logical portions: 1) the work to which Dr. Mallon contributed with the intent that it form a unified whole resulting in publication, and 2) the later work that made use of the earlier work, but with which Dr. Mallon disagreed and disavowed. This is no arbitrary division, but one that goes directly to the statutory requirement that joint authors must intend an inseparable or interdependent unitary whole.

While Dr. Mallon continues to maintain that portions of the work of the other authors must be removed to make it acceptable to him, he cannot simultaneously sustain the argument that he intended his work to remain part of a unitary whole with the published version. It is important to distinguish this from any intention Dr. Mallon may have had to create some other paper based on similar material, but recast in a version that excluded or reworked the portions to which he objected. This court is not concerned here with other versions that might have existed, rather it is tasked with addressing authorship of the paper published in PLoS Biology.

While Dr. Mallon wishes to interpret the statutory language concerning the "time the work was created" as the time that he feels his contribution to the project was made and his initial intent was formed, the Copyright Act provides that where a work "is prepared over a period of time, the

9

portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101.

The "work" in question is thus the version that was published in PLoS Biology. There is no mileage in trying to further determine the precise time that a work was created that incorporated the elements that prompted Dr. Mallon to cease to intend to merge his contributions into inseparable or interdependent parts of a unitary whole with the work of the other authors. It simply suffices that this did occur prior to the submission of the version that published in PLoS Biology. The record shows that Dr. Mallon's intent shifted with the development of the project, allowing this court to identify both different versions and a concomitant change in Dr. Mallon's qualification as a joint author within the meaning set out in the statute.

Dr. Mallon also points to *Greene*, in which an initial minor contribution to a work was found to entitle that contributor (Ablon) to copyright in the final work despite the fact that another author (Greene) had done the bulk of the work and carried it to completion. *Greene*, 794 F.3d at 151-52. However, the facts in *Greene* are quite distinct from the present case. In *Greene*, both authors were acknowledged as authors on the published book, and it was clear that both authors consented in the publication and intended the publication to form a unitary whole incorporating elements contributed by them both. *Greene*, 794 F.3d at 148-49. The present case cannot be analogized to this fact pattern. Dr. Mallon wasn't acknowledged as an author by the other authors. He didn't (and doesn't) consent to the publication of the final version, and neither did he intend that his work should be integrated with the materials of other authors to which he objected so strongly. *Greene* is instructive, but not in the way Dr. Mallon argues. Unlike Ablon, Dr. Mallon

10

fails to meet the intent-plus-contribution standard required by the statute and cannot therefore be cast, after-the-fact, as an author of the PLoS Biology paper.

Reviewing the evidence in the light most favorable to Dr. Mallon, no genuine question of fact exists because the record makes clear that Dr. Mallon did not intend to create the joint work that published as the PLoS Biology paper: his signed Declaration states as much, and the relief he seeks – to have the paper removed from publication – leaves little room for doubt that the PLoS Biology paper does not represent the integrated, unified work that he set out to create when he penned the draft manuscript submitted to Neuron with Dr. Marshall.

To the extent that the PLoS Biology paper includes material that can reasonably be said to be derived from the earlier work, the PLoS Biology paper could be a derivative work incorporating elements of the earlier work that Dr. Mallon and Dr. Marshall coauthored. However, it is unnecessary to resolve the issue of whether the PLoS Biology paper is, or is not, a derivative work, because the relief Dr. Mallon seeks rests only on whether or not the PLoS Biology paper is a joint work between himself and the authors. For the reasons stated above, it cannot be.

Similarly, this court need not address the issue of whether or not Dr. Mallon's scholarly work at Brown constituted a work-for-hire, whether and when he did the work, whether he was a faculty member, the meaning of the Brown University Patent Policy, or whether it formed part of the contract of employment between Brown University and Dr. Mallon. Although all these matters could be relevant in deciding if Dr. Mallon does, or could, hold a copyright in the earlier form of the work, whether he does or does not is irrelevant to the outcome here.

Finally, the court notes after carefully evaluating the record that this matter appears to have arisen out of a dispute concerning academic and scientific conduct during which copyright has

been invoked as a litigation device. Retractions are part and parcel of academic and scientific publication. Court ordered retractions are not.

## **Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. #48) is *granted*. Judgment shall enter for Defendants.


**SO ORDERED.**


/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**